**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS**

I, Victoria Mens, a Special Agent within the U.S. Department of Health and Human Services, Office of Inspector General, Office of Investigations, being first duly sworn, hereby depose and state as follows:

<u>**Affiant's Background**</u>

1.      I am a Special Agent with the U.S. Department of Health and Human Services Office of Inspector General ("HHS-OIG") and am currently assigned to the Boston Regional Office.  I have been a Special Agent with HHS-OIG for approximately six years.  Prior to working with the Boston Regional Office beginning in August 2024, I worked for the HHS-OIG Kansas City Regional Office.  As a Special Agent with HHS-OIG, I have received law enforcement training, and I have been personally involved in investigations concerning a variety of federal criminal offenses involving health care providers.

2.      The facts set forth in this Affidavit are based upon my personal observations, my training and experience, discussions with other law enforcement agents and officers, documents and records that were collected and reviewed in the course of this investigation, and reports prepared by individuals familiar with the subject of this Affidavit.  This Affidavit is intended merely to show that there is probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this Affidavit are related in substance and in part only.

<u>**Purpose of the Affidavit**</u>

3.      I submit this Affidavit in support of a warrant to search information associated with the following Microsoft accounts: cbarnett@icbdholdings.com (**SUBJECT ACCOUNT 1**) and cb@icbdholdings.com (**SUBJECT ACCOUNT 2** and, collectively with **SUBJECT**

**ACCOUNTS 1**, the "**SUBJECT ACCOUNTS**") that is stored at premises owned, maintained, or operated by Microsoft Corporation ("Microsoft"), an email, website, and cloud services provider headquartered at One Microsoft Way, Redmond, Washington.  In the event that the information belongs to a Microsoft enterprise customer, the government will not be able to request the data directly from the enterprise customer without compromising the integrity of the investigation. Therefore, I request that Microsoft retrieve all electronically stored information and preserve and produce it.

4.      The property (information) to be searched is described in the following paragraphs and in Attachment A, attached hereto, and incorporated as if fully set forth herein.

5.      This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Microsoft to disclose to the government records and other information in their possession (including the content of communications) located within the **SUBJECT ACCOUNTS**.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

6.      The items to be seized are the fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Section 1035 (false statement related to a health care matter); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Section 1347 (health care fraud); Title 18, United States Code, Section 1349 (conspiracy to commit wire fraud and health care fraud); Title 18, United States Code, Section 1956(h) (conspiracy to commit money laundering); and Title 18, United States Code, Section 1957 (transacting in criminal proceeds) (collectively the "**TARGET OFFENSES**"), as further described in Attachment B, which is also incorporated herein by reference.

7.      This request for search warrants originates from an investigation into a group of purported applied behavioral analysis clinics, **ABA Centers of America** ("**ABACA**"), for billing both federal and private health care benefit programs for medically unnecessary services, creating false and fraudulent records in order to justify higher reimbursement for services (such as by intentionally misrepresenting a place of service), and fraudulently manipulating and distorting the health care market by mandating that their therapists become non-credentialed with health care insurance benefit programs so that **ABACA** could bill services at a higher, out-of-network rate.

8.      This evidence, as well as other evidence described below, establishes probable cause to believe that the owners and operators at **ABACA**, **ICBD HOLDINGS** and **EXACT BILLING SOLUTIONS**, including Christopher Barnett ("**BARNETT**") and others associated with these businesses, submitted fraudulent requests for reimbursement for medically unnecessary services.  There is further probable cause to believe that **BARNETT** then used the ill-gotten proceeds from this fraudulent billing to make extravagant purchases to support a lavish lifestyle, such as a luxury automobiles.

9.      Additionally, there is probable cause to believe that evidence, fruits, and instrumentalities of the **TARGET OFFENSES** will be found during searches of the **SUBJECT ACCOUNTS**.

### Jurisdiction

10.     This Court has jurisdiction to issue the requested warrants because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  *See* 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within the District of New Hampshire.  *See* 18 U.S.C. § 3237.

**Relevant Entities and Individuals**

11.     **ABACA** is a health care provider of applied behavioral analysis therapy for children and minors diagnosed with a condition within the autism spectrum.  **ABACA** submits claims for payment to the New Hampshire Medicaid Program, including New Hampshire's Medicaid managed care entities, and various other private health care benefit programs, also known as insurance carriers.  **ABACA** is a Limited Liability Company organized under the laws of Delaware.  According to its website, **ABACA** has various locations, including in New Hampshire among other states.  The New Hampshire Secretary of State business records for **ABACA** indicate that its principal place of business is 110 East Broward Blvd., Suite #1100, Fort Lauderdale, Florida 33301.  The authorized business manager is listed as Agile Enterprises, LLC, located at the same address.  Florida Secretary of State business records for Agile Enterprises, LLC, indicate the business's authorized person is **BARNETT**.

12.     **BARNETT** was **ABACA**'s Chief Executive Officer ("CEO") until approximately early December 2024.  Since that time, **BARNETT** has served as Chairman of **ABACA**.

13.     **ABACA** is owned by **ICBD HOLDINGS**.  **ICBD HOLDINGS** is a Limited Liability Company organized under the laws of Florida.  The Florida Secretary of State business records for **ICBD HOLDINGS** indicate that its principal place of business is 110 East Broward Blvd., Suite #2400, Fort Lauderdale, FL 33301.  The authorized business manager is listed as Agile Enterprises, LLC, located at 110 East Broward Blvd., Suite #2400, Fort Lauderdale, FL 33301.

14.     Requests for reimbursement on behalf of **ABACA** are submitted to insurance carriers by **EXACT BILLING**, which is also owned by **ICBD HOLDINGS**.  **EXACT BILLING** is a Limited Liability Company organized under the laws of Florida.  The Florida Secretary of State business records for **EXACT BILLING** indicate that its principal place of business is 4620 North State Road 7, Suite #300, Lauderdale Lakes, FL 33309.  The authorized business manager

is listed as Agile Enterprises, LLC, located at 110 East Broward Blvd., Suite #1100, Fort Lauderdale, FL 33301.  The principal is listed as Michael Holzum Jr., at the location of **EXACT BILLING**.

<u>**Health Care Benefit Programs**</u>

15.     A "health care benefit program" under Section 24(b) of Title 18, United States Code, is defined as any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

16.     The New Hampshire Medicaid Program is a federal- and state-funded program that provides health care benefits to a wide range of individuals and families, including individuals with developmental disabilities.

17.     Blue Cross Blue Shield ("BCBS"), BCBS Anthem, Point 32 Health, United Healthcare, Cigna, and Optum offer  private health care benefit programs and government-funded health care benefit programs, such as a Medicaid managed care plans, that provide insurance contracts and plans affecting interstate commerce, under which medical benefits, items, and services are provided to individuals.

18.     Many health care benefit programs have a credentialing process to grant medical providers "in-network" status.  Through the credentialing process, health care benefit programs verify the education, training, and experience of medical providers.  When a provider is granted in-network status with a health care benefit program, they are considered a "credentialed," in-network provider and are then able to submit claims for reimbursement for treating patients who have coverage through that health insurance plan.  A credentialed provider agrees to receive a discounted reimbursement rate for medical services rendered.  A "non-credentialed" provider is

one who has not been credentialed and verified by a health care benefit program and is therefore considered out-of-network.

19.     A "single-case agreement" generally refers to a contract between a private health care benefit program and an out-of-network provider that allows a patient to see the provider while using their in-network benefits.  Private health care benefit programs rely upon the truth and accuracy of information furnished by providers to support the approval of single-case agreements. If a health care benefit program knew that a particular single-case agreement was predicated on materially false and fraudulent pretenses and representations, the health care benefit program would not authorize the single-case agreement and/or pay any claims under the agreement.

20.     To receive payment for services rendered, a provider is required to submit a claim to the health care benefit program.  Among other information, the claim generally requires the provider to indicate the date of service for the procedure, service received, diagnosis, place of service, and "CPT code," which refers to the "Current Procedural Terminology" codes used for billing particular medical procedures and services.

21.     Health care benefit programs and/or private insurance carriers rely upon the truth and accuracy of the claims submitted by providers to determine whether to pay the provider for the services rendered.  Claims for services also must be based on medical necessity.  If a health care benefit program knew that a particular claim was predicated on materially false and fraudulent pretenses and representations, or lacked medical necessity, the health care benefit program would not pay the claim.

**Probable Cause to Believe the TARGET OFFENSES Were Committed**

22.     The investigation thus far has revealed that **ABACA** fraudulently bills health care benefit programs through **EXACT BILLING** for medically unnecessary services purportedly

rendered in the District of New Hampshire and elsewhere by submitting claims that misrepresent the place of service, rendering provider, and medical necessity of the services.

23.    **ABACA**, through **EXACT BILLING**, additionally bills for services that do not qualify as legitimate medical treatment, such as when a client is napping or watching television. **ABACA** provides these purported therapy services based not on medical necessity, but based on an internal rating system that categorizes child and teenage patients based on the potential profits that **ABACA** can earn from that patient's health insurance, from "super payors," whose insurance reimburses the most, to "scholarship patients," whose insurance reimburses the least.

24.    **ABACA** ensures that it receives the highest reimbursement possible for these fraudulent and medically unnecessary services by requiring that its providers, who were in-network with insurance carriers before they started with **ABACA**, "de-credential" and thus become out-of-network with those insurance carriers, so that **ABACA** can receive the higher out-of-network reimbursement rate.  In order to make these out-of-network services appear medically justified, **ABACA** fraudulently obtains single-case agreements with insurance carriers, allowing **ABACA** to bill for excessive, medically unnecessary, and fraudulent treatment.

25.    As set forth below, through interviews of former **ABACA** employees, parents whose children were former patients of **ABACA**, and personnel employed  by various insurance carriers, the investigation has established probable cause to believe that **BARNETT** and others associated with **ABACA**, **ICBD HOLDINGS**, and **EXACT BILLING** have caused the submission of claims for reimbursement for medically unnecessary services purportedly provided to child patients on the autism spectrum.

I.        **Interviews with Former ABACA Employees**

    A.        **Kate Berlongieri, Exact Billing Solutions Director of Operations**

26.      On January 23, 2025, the government interviewed Kate Berlongieri ("Berlongieri"), who began working at **EXACT BILLING** as a Director of Training and Development and Director of Operations in July 2022.

27.      Berlongieri reviewed billing reports and data, which she then provided to **BARNETT**. **BARNETT** utilized Zoom, text, email, and phone calls to communicate with Berlongieri. Berlongieri had an **EXACT BILLING** email address, through which she had routine communication with **BARNETT**. **BARNETT** was a hostile employer who used fear to force employees to comply with his directives or risk being fired. **BARNETT** would call employees, including Berlongieri, and require that they meet him at **ICBD HOLDINGS**' office.

28.      **ABACA** utilizes a proprietary electronic medical records system, called ABA Connect. ABA Connect has its base of operations in Colombia. According to Berlongieri, the system routinely up-coded or down-coded the number of service units billed for services rendered, the system improperly adjusted the providers' names and/or notes originally outlined in the medical records as well as the place of service. Berlongieri exported Billing Census reports from ABA Connect and noticed discrepancies between the medical records and the data reported from ABA Connect. For example, the medical record outlined the number of units rendered was 7, but the Billing Census report exported from ABA Connect outlined the number of units rendered was increased to 8.

29.      Berlongieri recounted an instance in March or April 2023 in which she confronted the majority of the C-suite executives of **ICBD HOLDINGS** about fraudulent billing. Berlongieri informed management that **ABACA**'s billing was unethical, illegal, and fraudulent. Attendees

8

included Jonathan Gomberg, Rusty Taylor, Michael Holzum Jr., Barbara Kelly, William Klein, Steve Del Mauro, and Sean Westford.  Although **BARNETT** was not at the meeting, Berlongieri had discussed her concerns with him on several instances before the meeting.

30.    Berlongieri did not believe that the records reporting from ABA Connect was accurate in comparison to the services that were actually rendered by **ABACA**.  Berlongieri identified the following issues:

a. Discrepancies between the actual time that **ABACA** employees spent with patients when compared to the times listed in the data reports generated by ABA Connect.

b. Discrepancies between the place of service codes listed in the data reports compared to where services were actually rendered.  Berlongieri was instructed to bill the service based on a higher reimbursement rate, because changing the place of service to New Hampshire resulted in a higher reimbursement.  Berlongieri confirmed these directives were issued by **BARNETT**.

31.    Berlongieri confirmed that there were written communications from **BARNETT** with explicit instructions to follow company directives, which were sent via email to several different departments.

32.    After Berlongieri confronted **ABACA** management, she was instructed that she should look for a new job, if she did not agree with the billing practices.  Berlongieri subsequently left the company.

**B.    William Klein, EXACT BILLING Director of Utilization Review**

33.    On August 27, 2023, an anonymous report was submitted to Point32, which operates the Tufts and Harvard Pilgrim insurance carriers, by johns_2023@yahoo.com.  The email claimed that **ABACA** had a "CEO-led directive" to put patients on a single-case agreements due to the "obscenely high dollar amount" per unit of ABA treatment, charging $285 per therapy unit as compared to the national average of $25 per therapy unit.  The anonymous report alleged that

**ABACA** had an entire department dedicated to securing single-case agreements, which "masquerad[ed] as 'Patient Advocates.'"

34.    On November 8, 2024, William Klein ("Klein") was interviewed by Point32's Special Investigations Unit.  Klein worked at **ABACA** as the Director of Utilization Review from April 2022 to July 2023.  In that role, Klein was in charge of utilization review, authorization, and credentialing.  Klein also managed the single-case-agreement team.

35.    Klein explained to Point32 that the single-case-agreement team focused on converting **ABACA**'s current cases to single-case agreements.  An **ABACA** employee would reach out to a patient's family and educate them about how they could secure a single-case agreement to provide out-of-network coverage.  The **ABACA** employee would then facilitate communications with the family's insurance carrier, as well as assist in contacting in-network providers so that they could document that there were no available in-network providers.  When asked what would happen if an in-network provider in fact had availability, Klein explained that it was unlikely that any provider would have ability after **ABACA**'s single-case-agreement team's process because "[t]he line of inquiry hardly ever produce[d] an available provider."  Klein explained that it was common to have standard processes or scripts and that the calls "may not be done in good faith." If an **ABACA** employee pushed back on the single-case-agreement process, they were terminated.

36.    On January 6, 2025, the government interviewed Klein.  According to Klein, **ABACA** sought to obtain a single-case agreement for every **ABACA** patient.  He further explained that **ABACA** leadership would record the single-case-agreement team's calls with insurance carriers and then critique the team for not being aggressive enough in trying to maximize therapy hours.  Kelin described the single-case-agreement team as "a vessel to secure a higher rate."  Klein

believed that **ABACA**'s practice of requiring single-case agreements was dishonest and was motivated by high reimbursement rates.

37.    **ABACA** tracked single-case agreements in a spreadsheet. That spreadsheet was then saved on **ABACA**'s Microsoft OneDrive (a cloud-storage platform that supports storage and circulation of files across electronic devices) and emailed internally.

38.    At the conclusion of the interview, the government received an email from johns_2023@yahoo.com. That email included an attachment of a twenty-eight-page fraud tip report. According to a response from Yahoo, the email address johns_2023@yahoo.com uses a recovery phone number that belongs to Klein. The fraud tip report begins, "This report is based on direct knowledge of the internal workings of the companies, revealing potential fraudulent activity across a series of interrelated entities, including ABA Centers . . . Exact Billing Solutions, and other associated companies."

39.    According to the fraud tip report, **ABACA** systematically redirects claims for clients residing in Massachusetts to be billed through BCBS New Hampshire because BCBS New Hampshire offers full reimbursement rates that are significantly higher than the reimbursement rates provided by BCBS Massachusetts.

40.    The fraud tip report alleges that **ABACA** would request additional therapy units from insurance carriers, in contrast to what was actually recommended by the **ABACA** therapist treatment plan. **ABACA** would then mislead patients and their families about the legitimacy of these evaluations. The fraud tip report traces this back to **BARNETT**, whose "influence and pressure have led to a culture where the accuracy of diagnoses is second to the business goal of increasing client intake."

41.     According to the fraud tip report, **ABACA** categorized its minor patients based on insurance carrier reimbursement, including referring to minor patients whose insurance provided high reimbursement as "super payors." **ABACA** would then provide additional treatment to those "super payor" patients, even in instances in which it would be medically appropriate to reduce treatment over time.

42.     **ABACA** provided an incentive to its employees to bill for as many hours as possible, including paying bonuses ranging from $10,000 to $50,000 to employees who billed thirty to fifty hours of therapy per week.

43.     In addition to the fraud tip report's allegations involving health care fraud, the report makes a number of assertions that detail how **BARNETT** laundered the funds that he received from **ABACA** for his personal use. For example, the report describes how **BARNETT** diverted capital raised from loans that **ABACA** obtained, in order to fund his "personal luxuries," including a yacht, a $100,000-per-night private cruise, and attempting to acquire a private jet.

44.     The fraud tip report describes how "**BARNETT**'s business structure often uses different banking institutions, creating a complex network of accounts across multiple banks. This diversification across banks creates a patchwork of financial records that would require significant effort to trace, making it extremely difficult for investigators to follow the follow of funds through the companies. This strategy enables **BARNETT** to shift money between entities while avoiding patterns that might trigger alerts or inquiries. By separating funds into multiple accounts and banks, **BARNETT** minimizes transparency, ultimately making the money's true origin, purpose, and destination far more difficult to track."

45.     The fraud tip report describes ABACA's superficial collection of payments owed by patients. The report stated, "While patients typically bear a higher financial responsibility for

out-of-network services, the company (ABACA) often proposes a token payment plan, asking caregivers to pay a mere $1. This appears to be a superficial gesture to show a semblance of collecting due payments."

46.    According to the fraud tip report, the electronic database systems containing evidence of the described fraudulent activity include Microsoft 365 and Microsoft OneDrive.

**C.    Christina Peddlar, EXACT BILLING Utilization Review Specialist**

47.    On January 24, 2025, the government interviewed Christina Peddlar ("Peddlar"), who worked at **EXACT BILLING** in August 2022 where she was supervised by Klein.

48.    Peddlar was tasked with submitting authorization requests for applied behavior analysis, as well as initial assessments, treatment plans, and re-authorizations. to insurance carriers, including Optum/UnitedHealthcare, Cigna, Anthem, Harvard Pilgrim, Tufts, and BCBS Massachusetts.

49.    **EXACT BILLING** requested reimbursement of over $200 per 15 minutes of applied behavior analysis provided by **ABACA**. Treatment plans would prescribe therapy hours that were based on the patient's insurance, with those with higher insurance reimbursement rates getting more hours. Those patients were referred to as "super payors." Eventually, the company began referring to those patients as "scholarship providers."

50.    If patients were identified as super payors, their treatment plan was formulated by a separate assessment team, led by Quatiba Davis. Peddlar believed that "the assessment team was there to prescribe the most hours." Therapists at **ABACA** complained about the assessment teams because there were always differences of opinion between the therapists who provided the therapy and the assessment team. The therapists actually providing the therapy "had very little say" as to the number of hours that were prescribed. Peddlar believes that there were "clinically unnecessary

hours being prescribed" by the assessment team. **ABACA** had staff in Florida who performed diagnostic testing that were not doctors, despite the fact that such testing and evaluations are required to be performed by a doctor.

51. Peddlar recalled that patients would continue to receive thirty to forty hours per week of applied behavior analysis therapy after being with **ABACA** for over eighteen months. Peddlar identified this as a "red flag" because the treatment hours for those "super payor" patients were not changing.

52. If **ABACA** locations met the high number of hours prescribed, such as eleven to twelve hours of applied behavior analysis therapy per day, then those clinics would receive a bonus payment.

53. Staff communicated via email, using Microsoft Outlook, and Microsoft Teams. Peddlar worked remotely when she started with **EXACT BILLING**.

54. **EXACT BILLING** initially sought single-case agreements with insurance carriers that did not have out-of-network benefits. After **EXACT BILLING** management realized that they received a "really high" rate of reimbursement for their requests for reimbursement under single-case agreements, however, they began seeking single-case agreements for every patient. Peddlar specifically heard about a meeting in which **BARNETT** instructed staff to convert every single patient to a single-case agreement. Other management, including Eric Foust, Michael Holzum Jr., and Shaun Westberg also pushed for single-case agreements. The purpose of obtaining single-case agreements was to get, "more money per unit of the service code" that was billed. ABACA dismissed patients for which they could not secure single-case agreements and the reimbursement they wanted. Peddlar was then tasked with filing "unnecessary appeals" when insurance carriers declined to provide a single-case agreement.

14

    **D.**       **Amanda Morton, ABACA Clinical Director**

    55.    On January 23, 2025, the government interviewed Amanda Morton ("Morton"). Morton received her master's degree at New Mexico State University and has been a Board-Certified Behavior Analyst ("BCBA") since August 2015. She worked at **ABACA** from March 2022 through January 22, 2025. During her tenure, she worked as the Assistant Director of Training and Quality Assurance before being promoted to Clinical Director of **ABACA**'s Nasha, New Hampshire, and Portsmouth, New Hampshire, locations. While she was Clinical Director, Morton supervised approximately thirteen other Board-Certified Behavior Analysts.

    56.    Every patient at **ABACA** was categorized based on how much their insurance reimbursed, from "super payors," also called "scholarship providers," to "mid payors" and "scholarship." **BARNETT** created the guidance that established which patient would be in which category.

    57.    At a certain point, Morton was "demoted" to "concierge BCBA," meaning that her entire role was devoted to the care of a single patient, who had the highest reimbursement rate among **ABACA**'s clients. **ABACA** was reimbursed approximately $328 for every fifteen minutes that Morton spent with that client (or $1,312 per hour). **BARNETT** frequently discussed Morton's treatment of that patient, "track[ing] dollar by dollar, line by line." The patient was prescribed forty hours of applied behavior analysis therapy per week (which would be approximately $52,480 per week), which Morton felt was appropriate given how aggressive the patient was. If Morton or others failed to meet those forty hours a week, **BARNETT** was upset. Morton felt that there was a "grey area" when the patient was at school or taking a nap in which she was unsure that her work qualified as treatment.

58.    **ABACA** patients would have their treatment plans amended in order to increase the amount of service hours billed, without the knowledge of the patient's family or even the **ABACA** employee providing the therapy.

59.    Morton confirmed that, as recently as January 23, 2025, **ABACA** was intentionally misrepresenting the place of service for patients that received services in Massachusetts, reporting that the services had allegedly been provided in New Hampshire, in order to get a higher reimbursement rate.    **ABACA** had a map of patients that indicated the closest New Hampshire location for billing purposes.    Additionally, **ABACA** maintained a Key Performance Indicator sheet that tracked treatment hours and was sent to employees by **ABACA** Executive Directors.

60.    Morton utilized Microsoft Outlook and Microsoft Teams to communicate throughout her employment.    She received emails to an @abacenters.com account, including communication regarding the categorization of patients based on insurance carrier.

E.    **Dariya Yudina[1], ABACA Clinical Director**

61.    On October 31, 2024, and November 25, 2024, the government interviewed Dariya Yudina ("Yudina"), who has worked in the applied-behavioral-analysis field since approximately 2007, possessing a master's degree in mental health counseling from Boston College and a second master's degree in applied behavioral analysis from Simmons University.

62.    Yudina worked at **ABACA** as a Clinical Director from August 2021 through September 2022, before being promoted to Regional Director from September 2022 through November 2022.    During Yudina's time at **ABACA**, she was involved in numerous **ABACA** clinic locations across New Hampshire and Massachusetts.

---

[1] Dariya Yudina is currently represented by plaintiff's counsel, John Tocci, in a lawsuit against ABACA for failure to timely pay all wages owed to her.

63.     According to Yudina, **ABACA**, through a directive from **BARNETT**, required its clinicians to sign a form that de-credentialed them with insurance carriers.  The purpose of this practice was to force insurance carriers to pay higher out-of-network reimbursement rates to **ABACA**.  If the clinician refused to sign the form, they quit or were fired.  Later in her employment, Yudina was directed to prevent therapists from signing credentialing forms, which prevented those therapists from becoming in-network with insurance carriers.

64.     In order to make these out-of-network services appear medically necessary, **ABACA**, through the directive of **BARNETT**, sought to obtain single-case agreements with insurance carriers.  **ABACA** instructed patients' parents to contact an in-network provider and ask whether the provider had a waitlist.  **ABACA** then contacted the patients' insurance carriers to report that the patients needed applied behavioral analysis, but that their in-network providers had waitlists.  **ABACA** told the carrier that they did not have a waitlist and could provide services immediately, citing consistent staffing and therapy services to justify their expensive out-of-network rate.  Additionally, **ABACA** falsely represented that services were provided in New Hampshire, because insurance carriers provided a higher out-of-network reimbursement rate for services in New Hampshire.

65.     Yudina said that **ABACA**, through the directive of **BARNETT**, categorized minor patients into one of the following categories based on the reimbursement rate **ABACA** earned from the patients' insurance: "super payors," "mid payors," and "scholarship payors."  Patients within the "super payors" category were placed there because **ABACA** was reimbursed for more than 80% of the services billed and, as a result, these patients were provided more experienced **ABACA** clinicians, more therapy treatment, and more support and leniency.  Patients within the "mid payors" category were placed there because **ABACA** was reimbursed for between 60% to 80% of

the services billed.  Patients within the "scholarship payors" category were placed there because **ABACA** was reimbursed for less than 50% of the services billed.  As a result "scholarship payors" were provided fewer resources, less leniency, and fewer opportunities to complete the number of therapy hours detailed in their contracts with **ABACA**.  If patients failed to the complete the number of therapy hours in their **ABACA** contracts, then they were billed or were dismissed from treatment.

66.    Yudina believed that **ABACA**'s goal was to bill for as many therapy hours as possible, regardless of medical necessity.

**F.    Leanne Sanchez, ABACA Director of Operations**

67.    On January 3, 2025, Leanne Sanchez ("Sanchez") was interviewed by the government.  Sanchez was a Client Coordinator at **ABACA** from April 2022 through December 2022, before being promoted to Director of Operations at **ABACA**'s Peabody, Massachusetts, location.

68.    During her employment with **ABACA**, Sanchez was tasked with creating a spreadsheet to track and compare the number of treatment hours prescribed to children that were treated at the Peabody location with the number of treatment hours that **ABACA** employees actually rendered.  This spreadsheet was closely monitored by **BARNETT**.

69.    **ABACA** created a separate, color-coded spreadsheet that denoted each child's health insurance plan.  The color red denoted "scholarship" patients; the color yellow denoted "middle" patients; and the color green signified "non-scholarship" patients.  **ABACA** staff internally shared this spreadsheet weekly through email and Microsoft Teams.

70.    **BARNETT** and Kyle Berk ("Berk"), Executive Director of **ABACA**'s location in Peabody, Massachusetts, forced **ABACA** employees to deduct therapy services from "scholarship"

patients whose insurance did not pay well and to instead provide the therapy services to children whose insurances paid well.

71.     Sanchez stated that **ABACA** utilized Microsoft Teams for almost all internal communications. **BARNETT** met virtually with each **ABACA** location's executive directors. During those virtual meetings, **BARNETT** was frequently outraged when a particular location was not "hitting its numbers." Additionally, **ABACA** staff used Microsoft Teams to ask "quick questions" and used email to contact **BARNETT**.

**G.      Glenna Magowan[2], ABACA Board-Certified Behavior Analyst**

72.     On November 25, 2024, the government interviewed Glenna Magowan ("Magowan"), who holds a master's degree in both applied behavioral analysis and severe special education.

73.     Magowan worked at **ABACA** as a Board-Certified Behavioral Analyst from January 2022 through January 2023. Prior to Magowan's employment with **ABACA**, Magowan was credentialed as a provider with several insurance companies. After she was hired by **ABACA**, however, she was instructed by **ABACA** to sign a document that de-credentialed her with those insurance carriers.

74.     **BARNETT** informed Magowan about **ABACA**'s practice of categorizing minor patients based on their insurance reimbursement rates. **BARNETT** described the practice as a business model which allowed **ABACA** to prioritize the care of its "super payor" patients and provide them all of the authorized therapy hours in order to then accept more "scholarship payor"

---

[2] Glenna Magowan is currently represented by plaintiff's counsel, John Tocci, in a lawsuit against ABACA for failure to timely pay all wages owed to her.

patients.  If a patient or family was unable to accommodate all of the authorized therapy hours, **ABACA** dismissed them.

75.     According to Magowan, toward the end of her employment with **ABACA** most patients received treatment plans from **ABACA** that prescribed medically unnecessary therapy hours.  Magowan recalled two minor patients that she and another **ABACA** clinician were asked to assess.  Magowan recommended that the minor patients receive 24 hours of therapy per week. The other clinician recommended 40 hours.  Magowan was forced by an **ABACA** chief clinical officer to modify her recommendation in order to reflect the higher number of therapy hours per week.

76.     Magowan believed that **ABACA** focused on billing as many therapy hours as possible, rather than billing therapy hours that were medically necessary.  **ABACA** paid bonuses to employees when their clinic surpassed billing a certain number of hours.  If clinicians did not accomplish their billable hours, they were referred to as "low performers" or "bottom feeders."

**H.     Alyssa Duncan, ABACA Board-Certified Behavior Analyst**

77.     On December 17, 2024, the government interviewed Alyssa Duncan ("Duncan"), who worked as a Board-Certified Behavior Analyst at **ABACA** from September 2022 through September 2023.

78.     At the beginning of her employment with **ABACA**, Duncan assisted with the initial assessment of patients.  After she worked at **ABACA** for approximately six months, however, **ABACA** created a separate clinical intake team to conduct initial assessments, because Duncan and other therapists were not prescribing sufficient treatment hours to patients.[3]  Duncan believed

---

[3] Based on the other interviews, I believe that this other clinical intake team is the same assessment team run by Quatiba Davis in Florida and referenced by Peddlar, who believed that "the assessment team was there to prescribe the most hours."

that the number of treatment hours prescribed by **ABACA** was excessive and medically unnecessary. Staff struggled to provide the increasingly high number of patient treatment hours prescribed by **ABACA**, which caused a "revolving door" of caregivers, causing a disruption of continuity of care. Furthermore, **ABACA**'s practice of increasing patient treatment hours failed to consider the patients' time in school or treatment from other clinicians, such as occupational therapists.

79.     Duncan was motivated to work at **ABACA** because they offered a higher pay than most applied behavioral analysis clinics. Additionally, **ABACA** provided incentives and bonuses to their employees based on the number of treatment hours billed. Duncan believed that **ABACA** prioritized billing insurance and achieving higher billable hours for patients. She explained, "It was like a sport when the coach was obsessed with winning: 'Hit your numbers. Hit your hours. Bill, bill, bill.'"

**I.      Kayla McCarrier, ABACA Registered Behavior Technician**

80.     On December 19, 2024, the government interviewed Kayla McCarrier ("McCarrier"), a former Registered Behavior Technician employed by **ABACA** from August 2022 through August 2023.

81.     McCarrier reported that she was fired from **ABACA** because she refused to provide a minor patient with three additional therapy hours, after she had already provided the patient with three therapy hours on that same day. McCarrier told Kyle Berk, her supervisor and Executive Director at **ABACA**'s location in Peabody, Massachusetts, that the minor patient did not need six total hours of therapy. McCarrier believed that **ABACA** wanted to keep the minor patient at the center in order to bill for additional time.

82.     McCarrier provided the government with screenshots of a text message exchange with Berk, in which McCarrier refused to provide the additional therapy hours to the minor patient. In those texts, McCarrier was instructed by Berk that it was "not [McCarrier's] place to determine how long [the patient] should be there.  So you will be expected to remain with him for the remainder of the shift."  McCarrier expressed that it was her "place to advocate for [her] clients" because she was the one "directly working with him and seeing his progress."  In response, Berk told McCarrier, "I will not go back and forth with you.  You can either work with [the patient] or go home now."  When McCarrier declined to provide the additional therapy hours, **ABACA** assigned another Registered Behavior Technician to provide the therapy.

**J.      Chad Hodgdon, ABACA Admissions Coordinator**

83.     On January 23, 2025, the government interviewed Chad Hodgdon ("Hogdon"), who worked for a company owned by **ICBD HOLDINGS** for four months in 2020 before eventually starting with **ABACA**, where he worked as a Admissions Coordinator.

84.     Hodgdon said that **ABACA** would send three bills to their patients, requesting payment, but would tell those patients that they could do what they wanted with the bills and that they would not be sent to collections.

85.     According to Hodgdon, only admissions employees worked at **ICBD HOLDINGS**' office location, with other employees working remotely.  Internal communication was conducted via Microsoft Teams and email.  Hodgdon had daily meetings on Microsoft Teams regarding the "pipeline," which referred to clients that were set to begin services and needed single-case agreements.  **BARNETT** frequently reviewed the topics in the pipeline.

86.     **BARNETT** directed **ABACA** employees to pursue single-case agreements with insurance carriers.  Hodgdon believed that **ABACA**'s main motivation was reimbursement, not

medical necessity. **ABACA** would keep patients waiting for up to a year to receive services, telling the patients that they could not provide treatment without a single-case agreement.

87.    **ABACA** claimed that services were provided in New Hampshire, in order to maximize reimbursement, when they were in fact provided in Massachusetts. **ABACA** maintained a map of the state of Massachusetts that grouped patients by location to determine which New Hampshire location should be used to bill. If a client lived somewhere in or between Worcester and Framingham/Lowell, Massachusetts, that client was billed as though the service was provided in Nashua, New Hampshire. If a client lived in Boston or north of Boston, they were billed as though the service was provided in Portsmouth, New Hampshire. If a patient lived south of Boston, then they were billed to Salem, New Hampshire. Hodgdon believed that this directive came from **BARNETT**. If an employee expressed concern about the practice, then the employee was fired.

88.    **ABACA** had a physician located in Florida, Dr. Efrain "Costa" or "Acosta," who diagnosed patients and drafted reports of medical necessity. Hodgdon said that the doctor signed every report, regardless of actual medical necessity. The doctor was paid $500 per report.

89.    **ABACA** categorized patients based on insurance reimbursement, including "super payors." That information was tracked by **ABACA** in a document that could be exported to a Microsoft Excel spreadsheet.

90.    If clients failed to meet the high number of hours prescribed, including over thirty hours of treatment per week, the clients were placed on a contract to complete hours or were let go from treatment.

91.    Hodgdon said that **ICBD HOLDINGS** pays for **BARNETT**'s home in Fort Lauderdale.

K.          **Torie St. John, ABACA Registered Behavior Technician**

92.     On December 20, 2024, and January 24, 2025, the government interviewed Torie St. John ("St. John"), a Registered Behavior Technician at **ABACA** from July 2023 through August 2024.   According to St. John, a Board-Certified Behavior Analyst would perform an initial assessment with a patient.  **ABACA** management would then ask whether the patient could receive 40 hours of therapy per week.   These discussions were based on maximizing profits for **ABACA**, not what was medically necessary for the patient.

93.     **ABACA** categorized its minor patients as "super payors" and other categories, based on the patients' insurance.   Patients with BCBS and UnitedHealthcare were considered "super payors."  **ABACA** forced its employees to cancel services to Medicaid patients in order to provide more services to "super payor" patients.

94.     **ABACA** always wanted to maximize clinician schedules and insurance billing.  St. John cited an instance in which **ABACA** wanted to send a Registered Behavior Technician on vacation in Florida with a patient's family.   In another instance, when St. John attempted to end a session early because her patient had fallen asleep, she was instructed to remain at the patient's residence and bill for the amount of time that had been scheduled.   In other instances, if St. John tried to end a session early when a patient's family ate dinner, she was instructed to bill for the entirety of the scheduled session, regardless of the actual time spent rendering therapy to the patient.

95.     St. John was instructed to misrepresent services rendered in her treatment notes.  When she started with **ABACA**, St. John was not a Board-Certified Behavior Analyst.   She therefore could only provide treatment (and that treatment could only be submitted for billing) if she was supervised by a Board-Certified Behavior Analyst for the entire length of service.   She

was instructed, however, to provide supervision services and outline the corresponding billing under a licensed Board-Certified Behavior Analyst's name. When St. John's supervisor learned of this, she explained to **ABACA** staff that it was inappropriate.

96.     Ms. St. John reported to Kyle Berk,[4] Executive Director of **ABACA**'s Peabody, Massachusetts location. In turn, Mr. Berk reported to his boss, Ed McDonough. McDonough reported to **BARNETT**. Mike Holzum Senior acted as **ABACA**'s Chief Operating Officer. Ms. St. John recalled instances in which Mike Holzum Senior would categorize ABACA staff as "high-highs" and "low-lows" based on the number of hours that employee billed. When another **ABACA** employee elected to leave **ABACA**, Mike Holzum Senior confronted the employee, calling her "weak" and describing her as "low-low."

97.     Ms. St. John explained that **ABACA** communications were generally conducted over text but that the company also utilized Microsoft Teams. **BARNETT** typically communicated with **ABACA** Executive Directors via email which was in turn relayed to other **ABACA** staff.

## II.     Interviews with the Parents of ABACA Clients

### A.     Ann Marie Stackhouse

98.     On November 22, 2024, Ann Marie Stackhouse ("Stackhouse") was interviewed by the government. Stackhouse is the parent of a minor diagnosed with autism who received applied behavior analysis from **ABACA**. Prior to receiving treatment from **ABACA**, Stackhouse's child received approximately five hours per week of applied behavior analysis from other providers for approximately three years. When they began treatment with **ABACA**, Stackhouse's child was

---

[4] St. John identified Kyle by first name only. The government, through interviews with other former employees, has identified the Executive Director as Kyle Berk.

prescribed between twenty-five and thirty-six hours of therapy per week, in addition to one hour per week of parental training for Ms. Stackhouse.

99.    Stackhouse reviewed **ABACA**'s contract of care plan for Stackhouse's child and determined that **ABACA** inaccurately detailed that her child could not perform several activities that her child could, in fact, perform.    Stackhouse believed that **ABACA** intentionally mischaracterized her child's limitations as more severe in order to justify the number of therapy hours that **ABACA** prescribed.    When Stackhouse disputed and confronted **ABACA**'s inaccuracies and attempts to add additional therapy hours to Stackhouse's child's plan, **ABACA** told her, "We cannot accommodate that little amount of hours."

100.    Stackhouse installed a camera her child's bedroom to monitor the child.    During one of the child's therapy sessions, Stackhouse witnessed the **ABACA** employee typing on his cell phone for the entirety of the session.

**B.        Todd Kulaga**

101.    On December 13, 2024, Todd Kulaga ("Kulaga") was interviewed by the government.    Kulaga's child is a minor diagnosed with autism who received applied behavior analysis from **ABACA**.

102.    According to Kulaga, his child received treatment from between ten and twelve different clinicians while receiving treatment from **ABACA**.    Kulaga described these **ABACA** employees as young, with no formal education.    Kulaga explained, "they came and went like McDonald's employees."    Kulaga saw many of these **ABACA** employees preoccupied on their phones while they were allegedly providing therapy to his child.

103.    During **ABACA's** initial assessment of his child, **ABACA** employees asked Kulaga and his spouse how much they could afford to pay.    After Kulaga told **ABACA** that he could afford

$25 per month, that became the amount that **ABACA** charged his family every month for their copayment.

104.    Kulaga believed that his family was exploited by **ABACA**, who knew that his family was vulnerable because their child had recently been diagnosed with autism and consequently the family did not know how to navigate applied behavior analysis services.

105.    Kulaga's family has healthcare coverage benefits through BCBS Massachusetts.  A review of Kulaga's child's healthcare claims for services rendered by **ABACA** revealed that **ABACA** billed BCBS Massachusetts $485,835.00 for approximately four months of applied behavior analysis for Kulaga's child.  BCBS Massachusetts reimbursed **ABACA** $482,618.76 those services.

### III.    Interviews with Private Insurance Carriers

#### A.    Mindy Dummerth, Cigna Healthcare Investigator

106.    On December 6, 2024, the government spoke with employees from Cigna Healthcare regarding claims for services that the insurance carrier had received from **ABACA**. Mindy Dummerth ("Dummerth"), an investigator with Cigna Healthcare, reported the following information related to Dummerth's investigation of **ABACA**.

107.    **ABACA** frequently requests to initiate single-case agreements with Cigna customers.  From January 1, 2022, through the date of the government's interview, Cigna's commercial healthcare insurance was billed $119,134,616 by **ABACA** and paid **ABACA** $26,548,370.

108.    Through the course of Cigna Healthcare's investigation, Cigna obtained and reviewed records from **ABACA** and found that **ABACA**'s medical records lacked proper information to justify the billings.  Specifically, the records failed to identify the clinicians that

purportedly rendered services and failed to document the number of service units (that is, time increments of therapy) provided.  Additionally, **ABACA** engaged in fee-forgiveness with patients, that is, waiving an insurance beneficiary's copay or coinsurance.  Cigna Healthcare found that **ABACA** did not collect the appropriate fees, including copayments and deductible payments, for patients.  Cigna was concerned by **ABACA's** fee-forgiveness because it potentially incentivized patients to seek treatment from **ABACA** rather than other providers who appropriately charge fees from the patients.

109.    From my training and experience, I know that it can be a red flag of medically unnecessary billing when a provider waives a patient's out-of-pocket costs, such as co-pay or coinsurance payments, because it removes the patient's incentive to ensure that the provider is not billing for medically unnecessary services or services not rendered.  Additionally, the practice to waive patients' out-of-pocket costs incentivizes patients to seek services only from that provider.

**B.      Dr. Jessica Everett, BCBS Clinical Director**

110.    On December 9, 2024, the government interviewed Dr. Jessica Everett ("Dr. Everett"), a Clinical Director of Autism, Applied Behavior Analysis, and Neurodevelopment with BCBS Massachusetts ("BCBS MA").  Among other duties, Dr. Everett clinically evaluates applied behavior analysis service requests from providers submitted to BCBS MA.

111.    According to Dr. Everett, **ABACA** is an out-of-network provider for BCBS MA. Generally, BCBS MA does not engage in single-case agreements.  Nevertheless, **ABACA** submits requests to BCBS MA to initiate single case agreements for patients with BCBS MA health maintenance organization ("HMO") plans.  For patients with BCBS MA's preferred provider organization ("PPO") plans, **ABACA** requests to be reimbursed at their rates, which are significantly higher than BCBS MA's in-network provider rates.  For example, BCBS MA's in-

network provider rate is approximately $30 per unit for current procedural terminology (CPT) code 97151, the code used to bill for fifteen-minute increments of adaptive behavior assessment (meaning a one-hour session might be billed as $120 for four units of therapy). However, **ABACA** charges BCBS MA approximately $200 per unit for CPT code 97151 (meaning that a one-hour session might be billed as $800 for four units of therapy). In addition to charging $170 more for each therapy unit billed, **ABACA** also requests a higher number of units for CPT Code 97151 than most providers that submit reimbursement requests to BCBS MA.

112.    BCBS MA has been contacted by patients with PPO plans to report that **ABACA** informed them they are unable to provide treatment when single-case agreements are not granted. BCBS MA patients reported to Dr. Everett that **ABACA** calls BCBS MA in-network ABA therapy providers to inquire about their availability.

**IV.**    **Claims Data**

113.    The government has received claims data for **ABACA** claims submitted to Aetna, Anthem, BCBS, Cigna, Optum, Point32, and United Healthcare; all of these insurances' commercial plans were billed by **ABACA** and some of these insurances' government-funded plans were billed by **ABACA**. Even limiting those claims to only claims for reimbursement submitted to BCBS from **ABACA** in New Hampshire, between January 22, 2022, and April 22, 2024, **ABACA** submitted claims for reimbursement to BCBS for approximately $166,739,703.20. In turn, BCBS paid **ABACA** approximately $60,751,641.06.

**Probable Cause to Believe that Evidence of the TARGET OFFENSES**
**is Located in the SUBJECT ACCOUNTS**

114.    In my training and experience and open resources, I have learned that Microsoft provides a variety of online services, including electronic mail ("email") access, to the public. Subscribers may obtain email accounts from Microsoft at the domain name "[company].com." For

enterprise Office 365 accounts, as previously described, Microsoft allows subscribers to use a custom domain name for their email services.  Subscribers obtain an account by registering with Microsoft.  During the registration process, Microsoft asks subscribers to provide basic personal information.  Therefore, the computers of Microsoft are likely to contain stored electronic communications (including retrieved and unretrieved email for Microsoft subscribers) and information concerning subscribers and their use of Microsoft services, such as account access information, email transaction information, and account application information.

115.    A Microsoft subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), OneDrive files, and other files, on servers maintained and/or owned by Microsoft.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, OneDrive files, email in the account, and attachments to emails, including pictures and files.

116.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and experience, I know that, even if subscribers insert false information to conceal their identities, this information often provides clues to their identity, location, or illicit activities.

117.    In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  I also know that Microsoft typically maintains detailed audit logs of actions taken in the Office 365 and Azure AD environments.  In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

118.    In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

119.    Information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively,

to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the IP addresses from which users access the email account, along with the time and date of that access.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).  Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation.  For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

120.    In my training and experience and from open resources, I have learned that Microsoft provides a variety of online services, including electronic mail ("email") access, to the public.  These public accounts allow subscribers to send, receive, and store emails online.

Microsoft allows subscribers to obtain email accounts and create their own domain names such as @icbdholdings.com, like the email accounts listed in Attachment A.

121.    During the registration process, Microsoft asks subscribers to create a username and password, and to provide basic personal information. Microsoft typically does not verify the subscriber names; however, Microsoft does typically verify the email address or phone number provided. Therefore, the computers of Microsoft are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Microsoft subscribers) and information concerning subscribers and their use of Microsoft services, such as account access information, e-mail transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation, because the information can be used to identify the account's user or users.

122.    In my training and experience, I have also learned that email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

123.    Once a subscriber has registered an account, Microsoft provides email services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. Microsoft subscribers can also use that same username or account in connection with other services provided by Microsoft.

33

124.    A subscriber's Microsoft account can be used not only for email, but also for other types of electronic communication, including instant messaging, photo and video sharing, voice calls, video chats, and SMS text messaging.  Depending on user settings, user-generated content derived from many of these services is normally stored on Microsoft's servers until deleted by the subscriber.  Similar to emails, such user-generated content can remain on Microsoft's servers indefinitely if not deleted by the subscriber, and, even after being deleted, it may continue to be available on Microsoft's servers for a certain period of time.  Furthermore, a Microsoft subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on Microsoft's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a Microsoft account may be found within such computer files and other information created or stored by the Microsoft subscriber.  Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

125.    Based on my training and experience, I know that providers such as Microsoft also collect information relating to the devices used to access a subscriber's account, such as laptop or desktop computers, cellular phones, and tablet computers.  Such devices can be identified in various ways.  For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Microsoft in order to track what devices are using Microsoft's accounts and services.  Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and

International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Microsoft accounts created or accessed by the same device and likely belonging to the same user; (b) to find other types of accounts linked to the same device and user; and (c) to determine whether a particular device recovered during the course of the investigation was used to access the Microsoft account.

126.    Based on my training and experience and from open resources, I know that providers such as Microsoft use cookies and similar technologies to track users visiting Microsoft's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Microsoft. More sophisticated cookie technology can be used to identify users across devices and web browsers. From my training and experience, I know that cookies and similar technology used by providers such as Microsoft may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Microsoft account and determine the scope of criminal activity.

127.    Based on my training and experience, I know that Microsoft maintains records that can link different Microsoft accounts to one another, by virtue of common identifiers, such as common email addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Microsoft accounts. Based on my training and experience, I also know

that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who used a particular Microsoft account.

128.    In summary, based on my training and experience in this context, I believe that the computers of Microsoft are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved email), as well as Microsoft-generated information about its subscribers and their use of Microsoft services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide Microsoft with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

129.    As described above, witnesses have consistently reported that **BARNETT** uses his Microsoft accounts to communicate with **ABACA**, **ICBD HOLDINGS**, and **EXACT BILLING** employees, including specifically emailing instructions and company directives to his employees. **ABACA** further tracked single-case agreements and categorized their patients based on insurance carrier via spreadsheets that were emailed to staff and available on OneDrive.

130.    In addition to the witness interviews discussed above, grand jury returns confirm that **BARNETT** is using the **SUBJECTS ACCOUNTS** to conduct business and to spend funds acquired through his perpetrating the **TARGET OFFENSES**.  According to a return from Apple, in response to a grand jury subpoena, **BARNETT** used **SUBJECT ACCOUNT 1** as a verification account for his iCloud account.  From my training and experience, I know that this means that, in the event that **BARNETT** is ever locked out of his iCloud account, he can receive a verification code to **SUBJECT ACCOUNT 1**.

131.    According to return of financial records received from TD Bank in response to a grand jury subpoena, **BARNETT** used **SUBJECT ACCOUNT 1** when opening **ABACA**'s business checking account x8176 with TD Bank.  **BARNETT** also used **SUBJECT ACCOUNT 1** when opening **EXACT BILLING**'s business checking account x9257 with TD Bank.

132.    According to a return of financial records received from UBS Bank in response to a grand jury subpoena, **BARNETT** used **SUBJECT ACCOUNT 1** to open his Roth IRA account and an account for Christopher Barnett Trust x20717.

133.    According to a return from Ferrari, **BARNETT** used **SUBJECT ACCOUNT 1** in an application to finance purchasing a 2022 Ferrari SF90SP for a total sale price of $1,269,924.

134.    According to a return of financial records from UBS Bank in response to a grand jury subpoena, **BARNETT** used **SUBJECT ACCOUNT 2** to open account XL 06301 for Agile Enterprises LLC.  Likewise, **BARNETT** used **SUBJECT ACCOUNT 2** to open account x712 with UBS Bank for the Christopher M Barnett Family Foundation.

135.    According to a return from Ferrari, **BARNETT** used **SUBJECT ACCOUNT 2** to finance the purchase of a 2024 Ferrari Roma for a total sale price of $483,495.

## Special Instruction Regarding Review of Seized Material

136.    With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deem necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

137.    If, during the review of the seized material, the review team finds potentially privileged materials, the review team will: (1) immediately cease its review of the potentially

privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.

138.    Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of the seized material upon discovery of the existence of potentially privileged materials within the seized material.

## **CONCLUSION**

139.    For all of the reasons described above, there is probable cause to believe that evidence of the **TARGET OFFENSES**, as described above and in Attachment B of this Affidavit, will be found in searches of the **SUBJECT ACCOUNTS**, as further described in Attachment A of this Affidavit.

Sworn to under the pains and penalties of perjury.

/s/ Victoria E. Mens
Victoria E. Mens
Special Agent
Department of Health & Human Services
Office of Inspector General

Attested to by the applicant in accordance
with the requirements of Federal Rule of
Criminal Procedure 4.1 this  19th  day of
February, 2025.


_Andrea K. Johnstone_
_____
Andrea K. Johnstone
United States Magistrate Judge
United States District Court
District of New Hampshire
Date: ___**Feb 19, 2025**___

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with cbarnett@icbdholdings.com and cb@icbdholdings.com that is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company headquartered at One Microsoft Way, Redmond, Washington.

**ATTACHMENT B**

**Particular Things to be Seized**

I.    **Information to be disclosed by Microsoft Corporation ("Microsoft")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Microsoft, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Microsoft.  Microsoft is required to disclose to the government the **SUBJECT ACCOUNTS** or identifier listed in Attachment A the following information from June 1, 2021, to present, unless otherwise indicated:

A.  All business records and subscriber information, in any form kept, pertaining to the Account, including:

1.  Names (including subscriber names, user names, and screen names);

2.  Addresses (including mailing addresses, residential addresses, business addresses, and email addresses, including alternate and recovery email addresses);

3.  Telephone numbers, including SMS recovery and alternate sign-in numbers;

4.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions, including log-in IP addresses;

5.  Telephone or instrument numbers or other subscriber numbers or identities, including any temporarily assigned network address, SMS recovery numbers, Google Voice numbers, and alternate sign-in numbers;

6.  Length of service (including start date and creation IP) and types of service used;

7.  Means and source of payment (including any credit card or bank account number); and

8.  Change history.

       9.      Accounts associated by cookie, SMS, recovery email, or IP address.

B. All device information associated with the Account, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, Apple Hardware IDs and telephone numbers.

C. Records of user activity for each connection made to or from the Account(s), including, for all Microsoft services, the date, time, length, and method of connection, data transfer volume, user names, source and destination IP address, name of accessed Microsoft service, and all activity logs.

D. The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the size, length, and timestamp of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails. All forwarding or fetching accounts relating to the accounts.

E. Any records pertaining to the user's contacts, including: address books; contact lists; social network links; groups, to which the user belongs or communicates with; user settings; and all associated logs and change history.

F. Any records pertaining to the user's calendar(s), including: Calendar events; Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history.

G. The contents of all text, audio, and video messages associated with the account, including Microsoft Teams (including SMS, MMS, and RCS), in any format and however initially transmitted, including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size, length, and timestamp of each communication; user settings; and all associated logs, including access logs and change history.

H. The contents of all records associated with the account in Microsoft OneDrive, Microsoft 365 or Office 365 including: files, folders, media, notes and note titles, lists, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, other related services or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record.

I. All maps data associated with the account related to Bing Maps, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; My Maps data; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history.

J. All Location History and Web & App Activity indicating the location at which the account was active, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car), and associated logs and user settings, including Timeline access logs and change and deletion history.

K. All payment and transaction data associated with the account, including: records of purchases, money transfers, and all other transactions; address books; stored credit; gift and loyalty cards; associated payment cards, including any credit card or bank account number, PIN, associated bank, and other numbers; and all associated access and transaction logs, including IP address, time stamp, location data, and change history.

L. All Internet search and browsing history, and application usage history, including Microsoft Translate queries, Bing Search, Copilot, Edge Browser, and Cortana Assistant, including: search queries and clicks, including transcribed or recorded voice queries and responses; browsing history, including application usage; bookmarks; passwords; autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; user settings; and all associated logs and change history.

M. All records associated with Microsoft Advertising network utilization relating to the **SUBJECT ACCOUNTS**, including: any purchased advertising; information relating to targeting of Ads based on geolocation or user characteristics; internet domains associated with any ads or targeted ads and any records of users interacting with ads purchased or placed by the **SUBJECT ACCOUNTS**.

N. **Accounts associated by cookies, SMS number, Android ID, IMEI, telephone number, or recovery, secondary, forwarding, or alternate email address.**

O. For all accounts associated by cookies, SMS number, Android ID, IMEI, telephone number, or recovery, secondary, forwarding, or alternate email address, provide:

    1. Names (including subscriber names, user names, and screen names);

    2. Addresses (including mailing addresses, service addresses, residential addresses, business addresses, and e-mail addresses);

    3. Local and long-distance telephone connection records (including records of text messages sent and received);

4. Records of session times and durations;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including model type/numbers, phone numbers, IMSIs, IMEIs, MEIDs, UDIDs, MAC addresses, and advertising IDs);

7. Other subscriber numbers or identities, including any temporarily assigned network addresses (including the registration and session IP addresses with associated port numbers); and

8. Means and source of payment for such service (including any credit card or bank account number).

**Microsoft is hereby ordered to disclose the above information to the government within 14 DAYS of issuance of this warrant.**

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, or instrumentalities of false statements related to a health care matter in violation of Title 18, United States Code, Section 1035; health care fraud, in violation of Title 18, United States Code, Section 1347; wire fraud, in violation of Title 18, United States Code, Section 1343; conspiracy to commit health care fraud and wire fraud, in violation of Title 18, United States Code, Section 1349; conspiracy to commit money laundering, in violation of Title 18, Untied States Code, Section 1956(h); and transacting in criminal proceeds, in violation of Title 18, United States Code, Section 1957, those violations involving Christopher Barnett occurring June 1, 2021, including, for each Account or identifier listed on Attachment A, information pertaining to the following matters:

a. All communications among or involving ABA Centers of America LLC ("ABACA"), ICBD Holdings, and Exact Billing Solutions employees (current and former); and/or between and among employees (current and former) regarding business practices; autism therapy practices; patient care; compensation; government regulations concerning autism therapy services; compliance policies, procedures, and internal controls; government investigations; financial growth, financial health, revenue, hours billed, productivity of employees, metrics and goals; insurance programs; and strategic plans;

b.  All communications constituting, concerning, or referring to bills, invoices and claims for payment or reimbursement for services billed to government health care benefit programs and private insurance carriers, for any patients who received, or were billed for, services relating to autism therapy.  Among other records, this would encompass billing records, including electronic claim forms or claims, superbills, charge sheets, billing summaries, account details, provider agreements, requests or demands for payment from any health care benefit program or medical insurance company, health care program or medical insurance company correspondence, explanation of benefits, recoupments, overpayments and adjustments;

c.  Information related advertising, marketing, and acquisition of patients, including the use of Internet marketing and/or social media;

d.  Information related to credentialing and/or de-credentialing clinicians with insurance carriers;

e.  Information related to single-case agreements with medical insurance carriers;

f.  Information related to copayments and coinsurance requested or submitted;

g.  Information related to a categorization of patients based on their insurance carrier;

h.  Information related to the hiring of medical professionals, including the interview process, training, contracting, compensation, supervision, retention, response to patient complaints, and termination;

i.  Information related to patient records, including billing and/or claims records, agreements, assessments, evaluations, intake forms, progress notes, clinician case notes, plans of care, treatment summaries, notes related to services rendered, discharge summaries, discharge forms, hours of services, and correspondence or contact with the patient or the patient's guardian or representative(s) or the medical insurance provider;

j.  Information regarding any and all documents, records, and communications related to ABA Centers of America, ICBD Holdings, Exact Building Solutions, or any of their related entities' financial records, including: bank statements and records, records showing compensation from those entities, investor statements, tax records, cancelled checks, deposit and withdrawal slips and records, wire transfer records, financial statements, ledgers, journals, cash receipts, cash disbursement journals, loan documents, credit card statements and receipts, receipts of expenses and purchases, bills and receipts for utilities, phone and internet service, and other documents reflecting the receipt, disbursement, and transfer of funds and other monetary transactions, including ledgers tracking amounts of money provided to or received from those entities (and/or its affiliated entities) and/or tracking investments made on behalf of those entities and/or other individuals;

k.  Records and/or communications related to the alteration or destruction of documents, as well as the use of ephemeral messaging platforms (that is, digital messaging platforms that automatically delete messages within a certain time period after the message is sent and/or read, such as Signal or WhatsApp);

l.   Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

m.   Evidence indicating how and when the Subject Account and any associated or affiliated accounts were accessed or used, to determine the geographic and chronological context of account access and use, events relating to the crime under investigation, and relation to the account owner;

n.   Evidence indicating how and when the Account was accessed or used, to determine the geographic and chronological context of Account access, use, and events relating to the crime under investigation and to the Account owner;

o.   The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s); and

p.   The identity of the person(s) who communicated with the Account about matters relating to the Subject Offenses, including records that help reveal their whereabouts.